UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| ALFRED WILLIAM SMITH, | ) | |
| | ) | |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | No.  1:09-cv-188 |
| | ) | *Collier* |
| | ) | |
| JIM MORROW, Warden, | ) | |
| | ) | |
| *Respondent*. | ) | |

## MEMORANDUM

This is a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner Alfred William Smith ("Smith").  The matter is before the court on the respondent's, Warden Jim Morrow's, answer and Smith's reply, and the respondent's motion for summary judgment.  For the following reasons, the motion for summary judgment [Court File No. 11] will be **GRANTED**, the petition for the writ of habeas corpus will be **DENIED**, and this action will be **DISMISSED WITH PREJUDICE**.

## I.    Standard of Review

A state prisoner is entitled to habeas corpus relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254.  Under Rule 8 of the Rules Governing Section 2254 Cases In The United States District Courts, the court is to determine, after a review of the answer and the records of the

case, whether an evidentiary hearing is required. If no hearing is required, the district judge is to dispose of the case as justice dictates. If the record shows conclusively that Smith is not entitled to relief under § 2254, there is no need for an evidentiary hearing and the petition should be denied. *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986).

## II.    <u>Factual Background</u>

The respondent has provided the court with copies of the relevant documents as to Smith's direct appeal and post-conviction proceedings. [Court File No. 5, Notice of Filing Documents, Addenda I-III]. Smith was convicted by a jury, in the Circuit Court of McMinn County, Tennessee, of first degree premeditated murder, and was sentenced to life in prison. On direct appeal, Smith challenged, *inter alia*, the sufficiency of the evidence to support his conviction. The Tennessee Court of Criminal Appeals found the evidence was sufficient and thus affirmed the conviction. *State v. Smith*, No. E2004-01058-CCA-R3-CD, 2005 WL 1812830 (Tenn. Crim. App. Aug. 2, 2005) [Addendum II, Doc. 3].

In doing so, the Tennessee Court of Criminal Appeals summarized the evidence against Smith as follows:

> On Sunday morning January 12, 2003, the body of the victim, Betty White, was discovered near the edge of a field along McMinn County Road 448. The victim had suffered multiple trauma to her head and body, and her body had been run over by a vehicle.
>
> Shanda Bivens, a friend of the victim, testified that she visited the victim on January 11. In the midafternoon, a green car went by the victim's residence, and the victim said, "There goes Al." Later, the victim spoke on the telephone with someone she addressed as "Al," and Ms. Bivens overheard the victim tell the person, "It's over." The victim was upset and crying. Ten or

fifteen minutes later, the defendant, who had been the victim's boyfriend, stopped his vehicle on the road in front of the victim's residence, and the victim walked to the road to talk to the defendant. The vehicle was a green Mercury that the defendant and the victim owned jointly. The victim later talked on the phone again and told the person on the line, "It's over."

The victim's 18-year-old son, Dustin Rymer, testified that the defendant and the victim had maintained a relationship for five or six years before the victim's death. He testified that, on one occasion, he came to their residence and found the defendant holding a knife to the victim's throat, and a few days later he found the defendant with his fist drawn back to hit the victim in the face. On both occasions, Mr. Rymer chased the defendant away from the residence with a baseball bat. Mr. Rymer testified that these episodes precipitated an estrangement of the couple.

On the evening of January 11, 2003, Mr. Rymer came home about 8:30 and ate dinner. He then left to go to his girlfriend's house. The victim called Mr. Rymer about midnight and told him she would be ready to go to church the next morning. Apparently, Mr. Rymer came home and went to bed, but when he awoke Sunday morning, the victim was not in the residence. He learned of her demise about 11:00 a.m.

Bernice Cansler testified that in the late night of January 11 and early morning of January 12, 2003, she was standing on the premises of McMinn Villa hoping to obtain cocaine. She saw the victim, whom she knew, drive up in a green car, and the defendant, whom she also knew, was riding in the passenger seat. The defendant got out of the car and engaged in a conversation or transaction with another individual, got back in the green car, and left. The green car returned again between 3:00 and 4:00 a.m., and the same scenario was repeated.

Sherby Collom, the defendant's son-in-law, testified that the defendant occupied a room in the house where Mr. Collom and his family resided. When Mr. Collom came home from work about 11:00 p.m. on January 11, 2003, the green Mercury was parked in its usual place, and based upon the voices that Mr. Collom heard and recognized, the defendant and the victim were in the defendant's room. Mr. Collom noticed that the defendant and the victim were still in the defendant's room about 1:30 a.m., and when he awoke at 7:30 the next morning, the defendant was in his room asleep. Later that day, the police came to the house, and Mr. Collom gave them permission to search the house. A few days later, the family's puppies pulled out a pair of the defendant's

tennis shoes from under a rug in the laundry room, and Mr. Collom gave the shoes to the police. Also, one of the puppies pulled one of the Mercury's floor mats from behind an abandoned refrigerator behind the house. The mat was stained, and Mr. Collom gave it to the police.

Other testimony revealed that, on January 12, 2003, a bent, blood-stained machete with broken handles was discovered alongside the road in the general vicinity of the victim's body. A sheath that would have accommodated the machete was found in the grass near the victim's body.

Upon gathering information about the victim and her associates, the investigating officers went to the Collom residence in search of the defendant. The green Mercury parked in the Collom's yard had a clump of grass protruding from the driver's door. At the officers' request, the defendant unlocked the car and allowed them to inspect it. They found a large pool of blood in the front floor of the passenger's side. The floor mats were missing. What appeared to be blood on the passenger door had been wiped. Underneath the car, the officers saw what appeared to be blood and also black hair wrapped around a bolt on the undercarriage. The swatch of hair had caught an earring that matched an earring found in the center of the victim's neck at the crime scene.

A Tennessee Bureau of Investigation (TBI) agent who interviewed the defendant testified that the defendant showed no emotion when told that the victim had been killed. In the interview, the defendant admitted that he had been with the victim until midnight but that she had taken the Mercury home afterward. He claimed to have no knowledge how the car was returned to the Collom residence by Sunday morning.

Seriological tests revealed that the machete, the interior and the undercarriage of the Mercury, and the floor mat retrieved from behind the discarded refrigerator all bore the victim's blood. A pair of the defendant's tennis shoes also bore some of the victim's blood. An analysis of a laboratory slide containing material taken from the victim's vagina revealed the presence of the defendant's DNA. No fingerprints, however, were found on the machete, and the jeans worn by the defendant on the night of January 11-12 bore none of the victim's blood.

The McMinn County medical examiner testified that the victim suffered three different types of injuries. First, she sustained parallel slash injuries to the back of her right forearm. The injuries were caused by an object that was

not sharp-edged but one that was applied with enough force to break the arm. Second, the victim had been stabbed by a single-edge knife-there were "many, many" stab and slash wounds to the face, upper neck, and left side of the trunk. The victim's throat had been slit several times. Third, the victim sustained blunt force trauma from being dragged under the vehicle. This trauma resulted in broken ribs and a fractured right hip.

Testifying for the defendant, his daughter, Katrina Collom, opined that she would have heard the defendant using the washing machine or shower on the night of January 11-12, but she heard him do neither. Furthermore, he did not announce a departure from the house on Saturday night as he normally would do, were he leaving.

Mary Smith, the defendant's former wife, testified that she had engaged in altercations with the victim because of the victim's relationship with the defendant. She testified that, on one occasion, Dustin Rymer came to the Smith residence looking for the defendant. She testified that Mr. Rymer demanded to see the defendant and beat on the door with a "jungle knife."

*Id.*, 2005 WL 1812830 at **1-3.

Smith then filed a petition for post-conviction relief, in which he alleged he was denied the effective assistance of counsel at trial. The petition was denied after an evidentiary hearing and the Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief. *Smith v. State*, No. E2007-02457-CCA-R3-PC, 2009 WL 112569 (Tenn. Crim. App. Jan. 15, 2009) [Addendum II, Doc. 6], *perm. app. denied, id.* (Tenn. June 15, 2009) [Addendum II, Doc. 9].

In support of his petition for the writ of habeas corpus, Smith raises the following grounds for relief: (1) the evidence was not sufficient to support the conviction, and (2) he received ineffective assistance of counsel. The respondent contends he is entitled to

judgment as a matter of law as to each claim based upon the findings of the Tennessee state courts.

## III.  State Court Findings

Pursuant to 28 U.S.C. § 2254(d), Smith may not obtain federal habeas corpus relief with respect to a claim that was adjudicated on the merits in a state court proceeding unless the state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law or (2) was not reasonably supported by the evidence presented to the state court.  In addition, findings of fact by a state court are presumed correct and Smith must rebut the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e).

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), clarified the distinction between a decision "contrary to," and an "unreasonable application of," clearly established Supreme Court law under § 2254(d)(1).  A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Id*. at 413.  A state court decision "involves an unreasonable application of clearly established Federal law" only where "the state court's application of clearly established federal law was objectively unreasonable."  *Id*. at 409.  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the

relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

## IV. <u>Discussion</u>

### A. **Sufficiency of the Evidence**

Smith alleges the evidence was insufficient as a matter of law to support his convictions. Smith specifically claims he was convicted based upon circumstantial evidence, the evidence was not sufficient to prove he killed the victim, and that, if he did so, the killing was not premeditated.

In a federal habeas corpus proceeding in which a state prisoner challenges the sufficiency of the evidence supporting his conviction, the petitioner "is entitled to a determination whether the record evidence could support a finding of guilt beyond a reasonable doubt." *Moore v. Duckworth*, 443 U.S. 713, 714 (1979). However, Smith is entitled to habeas relief only "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). *See Brofford v. Marshall*, 751 F.2d 845, 856 (6th Cir. 1985).

When reviewing a jury's verdict under a sufficiency of the evidence standard, a court must consider all the evidence in a light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. at 319. Witness credibility is an issue to be left solely within the province of the jury, *Deel v. Jago*, 967 F.2d 1079, 1086 (6th Cir. 1992); *United States v. Schultz*, 855

F.2d 1217, 1221 (6th Cir. 1988), and substantial deference should be given to the trier of fact. *United States v. Ayotte*, 741 F.2d 865, 867 (6th Cir. 1984). "[T]he federal court sitting in habeas should not attempt to substitute its own opinion for that of the jury which convicted the petitioner." *York v. Tate*, 858 F.2d 322, 329 (6th Cir. 1988). A conviction should be affirmed if *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Bourjaily*, 781 F.2d 539, 544 (6th Cir. 1986), *aff'd*, 483 U.S. 171 (1987). In addition, proof of a crime by circumstantial evidence alone does not violate due process. *York v. Tate*, 858 F.2d 322, 328 (6th Cir. 1988).

The Tennessee Court of Criminal Appeals on direct appeal considered Smith's claim of insufficient evidence. The appellate court first articulated the standard under *Jackson* for challenging the sufficiency of the evidence to support a conviction:

> When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.

*State v. Smith*, 2005 WL 1812830 at *3 (citing *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)) (other internal citations omitted). The court also observed the following:

> In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence.

*Id*. at *4 (internal citations omitted).

The appellate court then set forth the elements of first degree premeditated murder under Tennessee law:

> The crime of which the defendant stands convicted is the "premeditated and intentional killing of another[.]" Once the evidence establishes that a homicide has occurred, it is presumed to be second degree murder. To elevate the crime to the greater offense of premeditated first degree murder, the state must prove premeditation.

*Id*. (quoting Tenn. Code Ann. § 39-13-202(a)(1) (2003)) (internal citations omitted).

With respect to premeditation, the court noted that "[a] premeditated act is 'one done after the exercise of reflection and judgment.'" *Id*. at *5 (quoting Tenn. Code Ann. § 39-13-201(b)(2) (2003)).

> "Premeditation involves a previously formed design, or actual intention to kill." It is the process "of thinking about a proposed killing before engaging in the homicidal conduct." "[N]o specific period of time need elapse between the defendant's formulation of the design to kill and the execution of that plan...." Premeditation "may be shown by circumstantial evidence." Thus, premeditation may be inferred from the circumstances surrounding the killing. For instance, facts which might allow a jury to infer premeditation include:
>
> > (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is planning activity;
> >
> > (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and
> >
> > (3) facts about the nature of the killing from which it may be inferred that the manner of the killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

In particular, Tennessee courts have identified some relevant circumstances: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing.

Tennessee courts have accepted the use of evidence of a homicide defendant's threats or prior violent acts directed toward the homicide victim as a means of allowing the state the opportunity to establish intent. The courts theorize that such evidence is probative of the defendant's *mens rea* at the time of the homicide because it reveals a "settled purpose" to harm the victim.

*Id.* (quoting *State v. Brown*, 836 S.W.2d 530, 539, 541 (Tenn. 1992)) (internal citations omitted).

The Tennessee Court of Criminal Appeals next concluded that the evidence was sufficient to prove that Smith killed the victim:

In the light most favorable to the state, the evidence not only supports the conviction beyond a reasonable doubt but also excludes every other reasonable hypothesis but that the defendant killed the victim. A rational trier of fact could have inferred that, on Saturday, January 11, 2003, the victim was trying to terminate her relationship with the defendant and that he was calling and coming to her residence in response to her declaration, "It's over." Later that evening, the victim and the defendant were together in the defendant's room at the Collom residence, and on two occasions thereafter, they frequented a drug trafficking location where the defendant apparently bought drugs.

Inferentially, the couple were last seen together between 3:00 and 4:00 a.m. The victim's hacked and mangled body was found only a few hours later. The car owned and used by the couple was found at the defendant's residence. It contained large amounts of the victim's blood, and the undercarriage of the car bore the victim's blood and her hair-unquestionably evidence of the vehicle's use to run over the victim. A floor mat containing the victim's blood had been removed from the car and placed behind an abandoned refrigerator. Although the machete that bore the victim's blood did not bear the defendant's fingerprints and although the clothes worn by the defendant on the night of January 11-12 did not bear the victim's blood, her blood was found on a pair of the defendant's shoes. The defendant engaged in sexual intercourse with the

victim within a period of time short enough to enable the toxicologist to detect the presence of his DNA on her vaginal slide. We hold that this evidence unerringly points the finger of blame at the defendant and supports the jury's conclusion that he murdered the victim.

*Id*. at \*4.

Finally, the appellate court concluded that "[t]he evidence also established beyond a reasonable doubt the element of premeditation." *Id*. at \*5.

The evidence in the present case showed that the defendant had previously evinced a purpose to harm the victim. Motive is suggested by evidence that, on the eve of her murder, the victim was trying to extricate herself from her relationship with the defendant and that he was not going away quietly. The victim and the defendant came together on Saturday night and spent several hours together. Based upon the events at McMinn Villa, drugs may have been involved in the couple's experience that night. Two different deadly weapons were used against the unarmed victim, and she was savagely stabbed and slashed many times. Apparently after she was stabbed and slashed in this manner, she was ejected from the car, and the driver ran over her and dragged her some distance underneath, tearing out hair, breaking ribs, and breaking a hip. Thus, the killing was particularly cruel. Also, it may reasonably be inferred that, subsequent to the homicide, the defendant returned to his residence, attempted to wipe the car door, removed and hid the blood-soaked floor mat, and went to sleep. When questioned later on Sunday, he evinced a calm demeanor and expressed no emotion when informed that the victim had been killed.

On balance, we hold that these facts support the jury's finding of premeditation.

*Id*. at \*\*5-6 (internal citations omitted).

This court has reviewed the transcript of Smith's trial [Addendum I, vol. 2-5, Transcript of Evidence, Vol. I-IV, pp. 112-430] and finds the decision by the Tennessee Court of Criminal Appeals is supported in the record. The evidence was clearly sufficient to prove that Smith was guilty of the murder. He and the victim were seen together only a

few hours before her body was found; the car in which they were seen was found at Smith's home and Smith unlocked the car with his keys at the request of the investigating officers; the victim's blood and hair were found in the passenger floor board and under the car, as was an earring that matched an earring found on the victim; a floor mat from the car with the victim's blood on it was found in Smith's home; and the victim's blood was found on Smith's shoes.

The evidence was likewise sufficient to prove premeditation. The victim was stabbed by a knife, slashed by a machete, and run over then dragged by a car; Smith and the victim had a contentious relationship and he had previously acted aggressively toward the victim; the victim had apparently decided to end the relationship; and Smith took steps to hide evidence of the murder.

The decision of the Tennessee Court of Appeals that the evidence was sufficient to support Smith's conviction for first degree premeditated murder was neither contrary to, nor did it involve an unreasonable application of, federal law as established in *Jackson v. Virginia*. Smith is not entitled to habeas relief on this claim.

Smith also claims that he is actually innocent of the crime for which he stands convicted and for that reason is entitled to habeas corpus relief. "Briefly stated, a fundamental miscarriage of justice occurs when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent." *Mitchell v. Rees*, 114 F.3d 571, 579 n.12 (6th Cir. 1997) (citations omitted).

Smith has failed to demonstrate, however, his innocence and thus is not entitled to relief on that basis.

**B.      Ineffective Assistance of Counsel**

In *Strickland v. Washington*, 466 U.S. 668 (1984) the United States Supreme Court established a two-part standard for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687.

To establish that his attorney was not performing "within the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson*, 397 U.S. 759, 771 (1970), Smith must demonstrate that the attorney's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 687-88. In judging an attorney's conduct, a court should consider all the circumstances and facts of the particular case. *Id*. at 690. Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). A finding of serious attorney incompetence will not justify setting aside a

conviction, however, absent prejudice to the defendant so as to render the conviction unreliable. *Id.* at 691-92.

Smith alleges three instances of ineffective assistance of counsel: (1) counsel failed to object to the conclusion of Dr. Toolsie that the victim's injury was an "overkill type injury;" (2) counsel failed to ensure that Smith voluntarily and knowingly waived his right to testify; and (3) counsel opened the door to the admission into evidence of Smith's prior bad acts. These were the same claims raised in Smith's post-conviction proceedings and on appeal to the Tennessee Court of Criminal Appeals.

> The Petitioner filed a petition for post-conviction relief in which he alleged that his trial counsel was ineffective for: (1) failing to object to expert medical testimony that the victim's injury was an "overkill type injury"; (2) failing to ensure that the Petitioner properly waived his right to testify; and (3) opening the door to the introduction of the Petitioner's prior bad acts.

*Smith v. State*, 2009 WL 112569 at *3.

The appellate court first summarized the evidence at the post-conviction hearing:

> At the hearing on the petition for post-conviction relief, the following evidence was presented: The Petitioner testified that he hired his trial counsel ("Counsel") approximately one year before his trial. The Petitioner said that he was incarcerated between the time of his arrest and his trial, and he estimated that Counsel came to visit him three or four times for about fifteen to twenty minutes each visit.

> The Petitioner said that he wanted to testify at his trial, and he and Counsel agreed that he would do so. In that regard, Counsel filed a motion to suppress some of the Petitioner's prior bad acts. In the motion, Counsel acknowledged that it was the Petitioner's intention to testify. The motion sought to exclude prior acts of domestic violence, and the trial court ruled that those would be inadmissible if the Petitioner testified. The Petitioner said that Counsel also filed a Notice of Alibi motion in which he acknowledged that the Petitioner may testify on his own behalf. The Petitioner asserted that, before

trial, he and Counsel always understood that he would testify at trial. Then, Counsel asked a witness whether the Petitioner was violent by nature. The trial judge ruled that Counsel had opened the door to the introduction of the Petitioner's prior bad acts, and Counsel advised him not to testify. In a meeting during the trial with Counsel, the Assistant District Attorney, and the trial judge, the Assistant District Attorney agreed that he would not mention the Petitioner's prior voluntary manslaughter conviction from Texas if the Petitioner did not testify. The Petitioner said that Counsel's actions opening the door resulted in the State being able to introduce multiple warrants that had been taken out against him. Further, because the Petitioner could not testify, he could not explain the circumstances of those warrants.

On cross-examination, the Petitioner testified that, at the time of his trial in this case, he had a prior criminal history, which included a voluntary manslaughter conviction. He also had other convictions, one of which was the result of a jury trial. The Petitioner agreed that Counsel told him that he would not make a "very good witness" and would likely do his case "more harm than good," but the Petitioner said that this was because Counsel had opened the door to the Petitioner's prior bad acts. The Petitioner agreed that Counsel successfully sought to exclude some witness testimony about the victim telling a witness that the Petitioner had acted violently toward her on previous occasions. The Petitioner said that he had no complaints about the graphic nature of Dr. Toolsie's testimony; rather, he posited that he did not inflict those injuries.

On redirect examination, the Petitioner testified that he had testified on his own behalf in two previous trials, the only two trials in which he had ever been a defendant before the current matter. The Petitioner said that, at the time he chose not to testify in this case, Counsel had advised him that his prior voluntary manslaughter conviction would be admitted if he testified. The State then pointed out to the Petitioner that the transcript showed that the State's attorney told the Petitioner that he would not mention the Petitioner's Texas conviction if the Petitioner testified and that this occurred before the Petitioner chose not to testify. The Petitioner claimed, however, that he understood the State's attorney to be saying that he would not bring up the conviction only if the Petitioner did not testify.

Counsel testified that the Petitioner retained him in this case. Counsel testified that, after the Petitioner retained him, he filed multiple motions on behalf of the Petitioner, including a motion to suppress the search of the Petitioner's house and car. The police found a large amount of the victim's

blood on the undercarriage of the car and some of the victim's blood in the car. The police also found the Petitioner in possession of the keys to the car and found that he had some of the victim's blood on his tennis shoes. Counsel recalled that a floor mat from the car was found behind a refrigerator at the Petitioner's house, and it contained the victim's blood. Counsel said that a witness testified that she saw the victim and the Petitioner together at 3 or 4 a.m. in an area known for drug activity, and the victim's body was discovered later that morning at 7 a.m.

Counsel said that he and the Petitioner developed a strategy that the Petitioner was not present at the killing and did not commit this crime. They relied in part on the statement that the Petitioner gave to police in which he explained he was asleep during the time of the murder. This statement was read into the record, and Counsel said that the statement being admitted into evidence factored into their decision about whether the Petitioner should testify. From interviewing the Petitioner, Counsel never felt the Petitioner would make a "great witness." Counsel noted that the victim was someone that the Petitioner had dated for a long time, and he did not show any type of emotion at her death. The Petitioner told Counsel that he was not an emotional man, but Counsel did not feel this would come across well to the jury.

Also with regard to the Petitioner testifying, Counsel said that he told the Petitioner before trial that the State would not be able to ask him about his prior conviction from Texas. During the trial, the judge changed that ruling. Counsel stated that he asked the Petitioner's daughter, who testified on the Petitioner's behalf if her father was a violent man. She said "no." He then asked her if she would "reference [her] father as a gentle man," and she responded affirmatively. The judge ruled that this question opened the door to the Petitioner's prior voluntary manslaughter conviction. Counsel prepared a brief to have the judge reconsider, but the State agreed not to use the conviction whether or not the Petitioner testified. Counsel said he explained this to the Petitioner. Counsel said the Texas conviction did not affect his advising the Petitioner not to testify. That advice, rather, was based upon the facts of the case, the performance of the State's attorney, and the Petitioner's prior domestic violence issues.

Counsel testified he successfully sought to exclude as hearsay some witness testimony about the Petitioner's prior acts of violence toward the victim. There was, however, other evidence from eyewitnesses who witnessed the Petitioner acting violently toward the victim. This evidence was admitted, and Counsel believed it was properly admitted.

Counsel testified that, because their strategy was that the Petitioner did not commit the crime, he did not object to Dr. Toolsie's testimony that this was an "overkill type injury." Counsel offered different suspects who could have committed this crime, one of whom was the Petitioner's ex-wife. Counsel said their strategy was to prove the Defendant did not commit the crime, as opposed to arguing he should be convicted of a lesser-included offense.

On cross-examination, Counsel testified Dr. Toolsie was the medical examiner who performed the autopsy. Counsel admitted he did not know before trial that Dr. Toolsie planned to opine to the jury that the victim's injuries were "overkill" type injuries, which were "usually but not always" perpetrated by someone who knew the victim. Counsel conceded that he was unaware at trial that the Tennessee Supreme Court had ruled that this type of testimony was inadmissible. Counsel said he would have objected to this portion of Dr. Toolsie's testimony had he known about the Tennessee Supreme Court ruling. Counsel said he did not think this testimony was damaging to the Petitioner, however, because their theory was that the Petitioner did not commit the crime. Further, they presented evidence that someone else who had known the victim killed her. Counsel agreed that evidence of domestic violence committed by the Petitioner was presented at the Petitioner's trial.

About the Petitioner testifying, Counsel said he and the Petitioner left that decision open up to and during the trial. They agreed that the Petitioner's testimony would be substantially similar to the statement that he gave to the police. Counsel said when the trial court ruled that Counsel opened the door to the Petitioner's prior bad acts, the State questioned the Petitioner's daughter about two different instances of specific acts of violence by the Petitioner toward her. Counsel did not object to the Petitioner's daughter's testimony about those specific acts of violence, and he said it was not a strategic decision to not object. He said, however, that he understood the trial judge's previous ruling to be that the Petitioner's prior acts of domestic violence were admissible, which was, in part, why he did not object to this testimony.

Counsel acknowledged that he called the Petitioner's ex-wife to testify. He explained it was his attempt to show that other people may have wanted the victim killed. He did not object to the State questioning the Petitioner's ex-wife about her volatile and violent relationship with the Petitioner because he thought that evidence would show that there was a love triangle between the Petitioner, his ex-wife, and the victim that could have gone wrong, resulting in the Petitioner's ex-wife killing the victim.

On redirect examination, Counsel agreed that the Petitioner's ex-wife testified:

> We got a divorce in 2002, and I hated him and I hated her, and I wanted both of them dead, and I went to Hiwassee Mental Health and tried to get some help because I was going to kill myself and I was going to kill them, and I told them.

The Petitioner's ex-wife also testified that she went to the Petitioner's house one night to kill the Petitioner and the victim. Counsel felt this favorable testimony was worth the trade-off for the domestic violence testimony. Counsel further testified his theory at trial was that, considering the number and type of wounds to the victim, this murder had to be perpetrated by more than one person.

After hearing argument, the post-conviction court entered a written order finding the Petitioner failed to prove he was entitled to post-conviction relief and denied the petition for post-conviction relief. It is from this decision that the Petitioner now appeals.

*Id*. at **3-6 (footnote omitted).

In analyzing Smith's claims of ineffective assistance of counsel, the Tennessee Court of Criminal Appeals first noted the two-part standard of review set forth in *Strickland*. *Id*. at *7 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

The appellate court then rejected Smith's arguments, with specific reference to the trial court's findings in denying post-conviction relief. This court has reviewed the transcript of Smith's post-conviction hearing [Addendum III, vol. 2, Transcript of Evidence, vol. I, pp. 1-86] and finds the conclusions by the trial court and by the Tennessee Court of Criminal Appeals are supported in the record.

With respect to Smith's claim that counsel should have objected to Dr. Toolsie's testimony, the court found as follows:

The Petitioner contends Counsel was ineffective for failing to object to Dr. Toolsie's testimony that this killing was an "overkill type injury," which was usually, but not always, committed by someone the victim knew. The Petitioner asserts this was beyond Dr. Toolsie's area of expertise and is not admissible pursuant to the Tennessee Supreme Court decision in *State v. Stevens*, 78 S.W.3d 817 (Tenn.2002). Counsel's failure to object, the Petitioner asserts, was ineffective and prejudiced him. The State notes in its response that Counsel explained his failure to object by stating that his theory of the case was that someone whom the victim had known killed her, namely the Petitioner's ex-wife. Further, it contends that the Petitioner did not prove that the failure to object prejudiced him.

The post-conviction court found:

> While petitioner's trial counsel might have handled the testimony of Dr. Toolsie ... more effectively, this court is satisfied the testimony complained of did not alter the outcome of the trial. At trial, there was evidence that on Saturday, January 11, 2003, ... Ms. White was attempting to terminate her relationship with the petitioner. In response, he was calling and coming to her residence and later that evening, he and Ms. White were together in the defendant's room at his daughter, Katrina Cullom's residence. On two occasions thereafter, petitioner and Ms. White were observed at a drug trafficking location where the petitioner appeared to purchase drugs. They were last observed at that location between 3:00 and 4:00 a.m. Ms. White's body was found only a few hours later. She had been stabbed, hacked and slashed. The car in which they were observed was found the same day her body was discovered at the petitioner's residence. It contained large amounts of blood in the passenger floor board, and the undercarriage of the car bore blood and a swatch of hair. The blood and hair were identified as being that of Ms. White. A floor mat from the vehicle containing Ms. White's blood was later found behind an abandoned refrigerator in the residence where the petitioner lived. Ms. White's blood was found on a pair of petitioner's shoes. The petitioner's DNA was found in Ms. White's vagina, indicating they recently had sexual intercourse. This evidence so strongly leads to the conclusion that petitioner killed Ms. White that the testimony complained of was not a significant factor in

his conviction. The admission of this testimony does not undermine this court's confidence in the outcome of the trial.

We conclude that the evidence does not preponderate against the post-conviction court's findings. The testimony presented comported with Counsel's theory of the case, i.e. that the Petitioner's ex-wife, who had admittedly threatened the victim's life in the past, had committed this killing. The fact that this strategy or theory failed does not prove that Counsel was ineffective. Further, the Petitioner has not proven he was prejudiced by Counsel's failure to object to this testimony.

*Smith v. State*, 2009 WL 112569 at **8-9.

As the Tennessee Court of Criminal Appeals noted, the defense theory was someone else was guilty of the murder and the defense attempted to portray Smith's ex-wife, Mary Smith, as the perpetrator. The defense called Ms. Smith as a witness. [Addendum 1, vol. 5, Transcript of Evidence, Vol. IV, p. 410]. Ms. Smith admitted when she first learned of the affair between her husband and the victim, she "tried to beat the crap out of her, and the police was called, and he called 911 on me because I shot at them." [*Id*. at 412]. She also admitted on several occasions she beat and shot at the victim, [*id*.]; that the last time she caught the victim in her house "I beat her, I beat her," [*id*. at 413]; that after her divorce from her husband, Ms. Smith "hated him and [] hated her, and [] wanted both of them dead, [*id*. at 415]; and that "I beat the crap out of her every time I would see her and catch her in my house and in my bed." [*Id*. at 416].

Dr. Toolsie's testimony the murder was "an overkill type injury" could be used to support the theory Mary Smith killed the victim because she hated her so much. Accordingly, Smith's counsel was not ineffective in failing to object to the testimony.

With respect to Smith's waiver of his right to testify, the Tennessee Court of Criminal Appeals found as follows:

> The Petitioner next contends Counsel was ineffective for failing to ensure that the Petitioner properly waived his right to testify. He asserts that he always wanted to testify and did not knowingly and voluntarily refuse his right to testify. The Petitioner notes that the colloquy between he and the trial court regarding his right to testify was inadequate, citing *Momon v. State*, 18 S.W.3d 152 (Tenn.1999). The State counters that a failure to follow the *Momon* guidelines does not in and of itself support the Petitioner's claim and that the Petitioner knowingly waived his right to testify. When deciding this issue, the post-conviction court found:

>> While the questions asked petitioner by the trial judge concerning this issue were perhaps not sufficient to establish he voluntarily and personally waived his right to testify in his own behalf as required by *Momon, supra*, this court is satisfied from the evidence presented that the petitioner personally made the decision not to testify and that this decision was voluntarily made. Had his counsel asked the appropriate questions or encouraged the court to do so, in this court's opinion, [there is] no reasonable probability it would have resulted in his testifying during the trial.

> We conclude that the evidence does not preponderate against the trial court's findings. The Petitioner clearly understood that he had a right to testify, as he so stated at the post-conviction hearing. He said that at the time he chose not to testify he was under the mistaken impression that his conviction from Texas for voluntary manslaughter would only come into evidence if he testified. Further, he said that the only reason he did not testify was that this conviction would potentially be admitted into evidence. However, the record clearly indicates and the Petitioner acknowledges that the record shows that the prosecutor said that he would not mention the Texas conviction regardless of the Petitioner's decision to testify. The post-conviction court found that "the petitioner [did not] fail[ ] to testify because of a fear of the Texas conviction being used against him." We agree, and we fail to see how further questioning of the Petitioner about his waiving his right to testify would have changed the Petitioner's decision to testify or have changed the outcome of the trial.

*Smith v. State*, 2009 WL 112569 at **9-10.

To the extent Smith contends the trial court failed to comply with the procedure mandated by the Tennessee Supreme Court in *Momon*, his claim "is not cognizable in a federal habeas corpus proceeding." *Spalla v. Foltz*, 788 F.2d 400, 405 (6th Cir. 1986); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions"); *Lewis v. Jeffers*, 497 U.S. 764, 779 (1990) ("federal habeas corpus relief does not lie for errors of state law"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."); *Sinistaj v. Burt*, 66 F.3d 804, 807 (6th Cir. 1995) ("Errors of state law alone cannot form the basis of relief under federal habeas corpus."); *Houston v. Dutton*, 50 F.3d 381, 385 (6th Cir. 1995) ("When and how state law applies to a particular case is a matter on which the state supreme court has the last word. No federal issues are implicated and no federal question is presented in determining whether a change in state law is to be applied retroactively.") (citation omitted).

The trial transcript reflects the prosecutor stated he would not attempt to use Smith's Texas conviction for manslaughter, whether Smith testified or not. [Addendum 1, vol. 5, Transcript of Evidence, Vol. IV, pp. 424-25]. The transcript also reflects that Smith was placed under oath, stated his understanding of his right to testify and, after discussing the matter with his attorney, decided not to testify. [*Id*. at 426-27]. Counsel was not ineffective in this regard.

With respect to Smith's claim his attorney opened the door to the introduction of Smith's prior bad acts, the Tennessee Court of Criminal Appeals found as follows:

The Petitioner contends that Counsel was ineffective by opening the door to the introduction of the Petitioner's prior bad acts. Specifically, the Petitioner complains that Counsel, when questioning Shandra Bivens, opened the door to testimony about the Petitioner's violent acts towards the victim. The record indicates that Counsel asked Shandra Bivens if she had ever seen the Petitioner threaten the victim. Bivens responded negatively. The State requested a jury out hearing where it suggested that Counsel had opened the door to questions about the Petitioner's violent acts toward the victim. The State then questioned the victim's son about a specific instance where he saw the Petitioner holding a knife to the victim's throat. The post-conviction court found that the victim's son's testimony was properly admissible as a means of allowing the State the opportunity to establish intent. *State v. Smith*, 868 S.W.2d 561, [575] (Tenn. 1993). Therefore, the post-conviction court held that Counsel's actions did not warrant the Petitioner post-conviction relief. We agree. As this evidence was admissible pursuant to *Smith*, we cannot conclude that the Petitioner was prejudiced by its admission.

The Petitioner also complains that Counsel opened the door to the Petitioner's violent acts toward other victims, namely Katrina Cullom, his daughter, and Mary Smith, his ex-wife. Counsel asked Cullom if her father was a violent person, to which she responded negatively, and if her father was a gentle man, to which she responded affirmatively. The State again suggested that this opened the door to specific instances of violent conduct by the Petitioner. The trial court agreed, and the State questioned Cullom about an incident during the week of the murder when her father got a gun, clip, and bullets out of a cardboard box. She asked what he was doing, and he laughed. Cullom said that she could tell that the Petitioner was "high" and that he was a different person when he was "high." The State also questioned Cullom about a time when the Petitioner acted violently toward her. The trial court also allowed the State to ask Mary Smith about the Petitioner's previous domestic abuse against her and his threats to kill her. The admission of this testimony, the Petitioner contends, prejudiced him. The State counters that the weight of the convicting evidence was so great that confidence in the validity of the verdict is not undermined by the admission of this testimony.

With regard to this argument, the post-conviction court concluded, "While petitioner's trial counsel might have handled the testimony of ... Ms. Cullum and Ms. Smith more effectively, this court is satisfied the testimony complained of did not alter the outcome of the trial." We agree. As previously outlined in this opinion, and in our opinion on the Peititoner's [sic] first direct appeal, the weight of the convicting evidence "not only supports the conviction

beyond a reasonable doubt but also excludes every other reasonable doubt that the defendant killed the victim." *Smith*, 2005 WL 1812830, at *4. The Petitioner simply has not shown that the outcome of his trial would have been different had this testimony not been admitted. He has not therefore carried his burden of proof with regard to prejudice. He is not entitled to relief on this issue.

*Smith v. State*, 2009 WL 112569 at **10-11.

As noted previously, the evidence of Smith's guilt was overwhelming. Any alleged error on the part of counsel in opening the door to evidence of Smith's prior bad acts did not affect the results of the trial. That being so, Smith has failed to demonstrate he was prejudiced by his attorney's alleged ineffective assistance in this regard. *See Austin v. Bell*, 126 F.3d 843, 847 (6th Cir. 1997) ("Ineffective assistance of counsel occurs when an attorney's deficient performance prejudices the defense and renders the trial unfair and the result unreliable."). As the Supreme Court has stressed, the focus must be on "whether the result of the proceeding was fundamentally unfair or unreliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). "To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." *Id*. at 369-70.

The findings of the state courts are supported in the record and are neither contrary to, nor do they involve an unreasonable application of, federal law as established in *Strickland v. Washington*. Smith's attorney presented a spirited defense on behalf of Smith. Unfortunately for Smith, the evidence of guilt was more than sufficient to support Smith's convictions. Based upon the foregoing, Smith has failed to demonstrate he received

ineffective assistance of counsel under the *Strickland* standard. He is not entitled to relief on this claim.

## V.     Conclusion

The respondent's motion for summary judgment will be **GRANTED**, the petition for habeas corpus relief will be **DENIED**, and this action will be **DISMISSED WITH PREJUDICE**. Rule 4 of the Rules Governing Section 2254 Cases In The United States District Courts. Smith having failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**. 28 U.S.C. § 2253(c); Rule 22(b) of the Federal Rules of Appellate Procedure. The court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. *See* Rule 24 of the Federal Rules of Appellate Procedure. The court will further **DENY** Smith leave to proceed *in forma pauperis* on appeal.

**An appropriate order will enter.**


**/s/**_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**